UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| LARRY LEON COUFFER, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | NO. 7:05-CV-0054-AH |
| § | |
| JO ANNE B. BARNHART, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the written consent of the parties to proceed before a United States Magistrate Judge and the District Court's Transfer Order filed on August 2, 2005, in accordance with the provisions of 28 U.S.C. § 636(b), came on to be considered Plaintiff Larry Couffer's action brought under 42 U.S.C. § 405(g) seeking judicial review of Defendant's denial of Plaintiff's application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 423.

Procedural History: On August 5, 1999, Plaintiff filed his application for disability insurance benefits alleging disability since June 15, 1992, due to a back pain, stomach pain, arm pain and an inability to concentrate. (Administrative Record 48-50, 63 [Hereinafter Tr.].)

An Administrative Law Judge ("ALJ") conducted a hearing on September 13, 2000. (Tr. 259.) On February 23, 2001, the ALJ denied Plaintiff's request for disability insurance benefits, finding that he was not disabled and had the residual functional capacity to perform a wide range of light labor. (Tr. 227.) Mr. Couffer timely requested a review of the ALJ's decision by the Appeals Council and on June 6, 2002, the Appeals Council granted his request, vacated the

ALJ's opinion and remanded the case to the ALJ for further proceedings to clarify Plaintiff's self-employment history, to utilize the sequential evaluation process to fully evaluate Plaintiff's allegations of disability, and to obtain evidence from a vocational expert regarding the effects, if any, of Plaintiff's non-exertional limitations on his capacity to engage in substantial gainful activity. (Tr. 234-36.) In accordance with the order of remand a second hearing was held on November 20, 2002. (Tr. 280.) On January 31, 2003, the ALJ denied Plaintiff's request for disability insurance benefits and found that Plaintiff retained the capacity to perform skilled work at the light exertional level that did not involve prolonged sitting or constant repetitive twisting, turning, bending or stooping of his back. (Tr. 23.) Plaintiff again timely requested review of the decision by the Appeals Council, and on January 12, 2005, the Appeals Council denied his request. (Tr. 7.) Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review. *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002). Plaintiff filed his federal complaint on February 28, 2005. Defendant filed an answer on April 27, 2005. On August 26, 2005, Plaintiff filed his brief and on September 29, 2005, Defendant filed his brief.

Standard of Review–Social Security Claims: When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of whether: (1) the ALJ's decision is supported by substantial evidence and (2) the proper legal standard was applied.[1] *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (citing *Villa v. Sullivan*, 895 F.2d 1019,

---

[1] "The scope of judicial review of a decision under the Supplemental Security Income Program is identical to that of a decision under the Social Security Disability Program." *Harrell v. Bowen*, 862 F.2d 471, 475 n.4 (5th Cir. 1988) (citing *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985)). Likewise, the relevant laws and regulations governing the determination of disability are identical under both programs. *Davis*, 759 F.2d. at 435 n.1.

1021 (5th Cir. 1990)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). In determining whether substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment. *Id.* at 1022 (quoting *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988)). Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971)).

Discussion: To prevail on a claim for disability insurance benefits, a claimant bears the burden of establishing that he or she is disabled, which is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 404.1505. Substantial gainful activity is defined as "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. Where a claimant applies for disability insurance benefits, the claimant must prove the existence of a disabling impairment between the claimant's alleged onset date and the date last insured. *See Moss v. Apfel*, No. 98-20215, 1999 WL 130146, at *1 (5th Cir. Feb. 12, 1999) (citing 20 C.F.R. § 404.320(b)(2)).

The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the first four steps, a claimant has the burden of proving that

his disability prevents him from performing his past relevant work, but under the fifth step, the burden shifts to the Commissioner to prove that there is other substantial gainful activity that the claimant can perform. *See*, *e.g.*, *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989). This burden may be satisfied either by reference to the Medical-Vocational Guidelines ("Grid Rules") of the regulations, *see* 20 C.F.R. § 404.1569 & Subpt. P, App. 2, or by expert vocational testimony or other similar evidence. *See*, *e.g.*, *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

In this case, the ALJ proceeded to step five and utilized the testimony of a vocational expert to determine that Mr. Couffer was not disabled. (Tr. 18-23.) He therefore denied Plaintiff's request for disability insurance benefits. (Tr. 23.)

The documents contained in the administrative record reflect the following chronology of medical care:[2]

Plaintiff saw psychologist Dr. Martin Deschner, Ph.D. on January 13, 1993, for a behavioral health followup. (Tr. 180.) Plaintiff reported experiencing increasing pain while working, and admitted that he had significant anxiety regarding whether he would be able to return to his old job. (Tr. 180.) On the same day, Plaintiff saw Dr. Alexis Shelokov regarding back pain. (Tr. 181.) Dr. Shelokov reported that Plaintiff had an abnormal disk, but that the abnormal disk was not the source of his pain. (Tr. 181.) Dr. Shelokov opined that Plaintiff was not a good candidate for surgery and that he was disabled from gainful employment. (Tr. 181.)

---

[2] Couffer's eligibility for Title II disability benefits expired on December 31, 1997, the last date of his insured status ("LDI"). In order to be entitled to benefits a claimant must have become disabled, as the that term applies to the Social Security Act, on or before the date on which coverage expires. *See*, *e.g.*, *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990). Therefore, the court summarizes the medical care records which pre-date December 31, 1997.

Plaintiff saw Dr. Shelokov on February 17, 1993. (Tr. 179.) The doctor noted that Mr. Couffer had a Lidocaine discogram at the L4-5[3] disk which relieved his pain transiently. (Tr. 179.) Dr. Shelokov determined that Plaintiff could not "live with his pain" and was disabled from gainful employment. (Tr. 179.) He recommended that Plaintiff undergo a level two fusion.[4] (Tr. 179.)

On April 15, 1993, Plaintiff saw Dr. Mark Pretorius for a pre-surgery consultation. (Tr. 117.) Dr. Pretorius conducted an electromyogram ("EMG") and nerve conduction study on Mr. Couffer which revealed that he was suffering from mild chronic L5 radiculopathy[5] on the right lower extremity. (Tr. 176.) All other results were within normal ranges. (Tr. 176.) The doctor noted that Plaintiff injured his back at work when he slipped and fell backwards while carrying a five gallon bucket of oil. (Tr. 117.) Mr. Couffer complained of back and lower extremity pain, with the pain radiating down the posterior thigh and extending to the right heel or the big toe in the right foot. (Tr. 117.) A physical examination did not reveal that he was suffering any motor impairments. (Tr. 117.) Plaintiff reported smoking one and one half packs of cigarettes per day. (Tr. 117.)

Mr. Couffer had surgery at Presbyterian Hospital of Plano on April 20, 1993, to fuse sections L4-5 and L5-S1 of his spine. (Tr. 106.) During the procedure, a bone-growth

---

[3] "The letter L followed by a number identifies a specific vertebra in the lumbar spine." North American Spine Society, Glossary of Spinal Terms, http://www.spine.org/fsp/glossary.cfm (last accessed May 5, 2006). The letter L followed by two numbers separated by a hyphen refers to a disk between the two vertebrae. *Id.*

[4] A spinal fusion is "a surgical procedure performed to eliminate movement over painful or unstable spinal segments...Bone is grafted across a section of the spine where it grows together fusing the area." North American Spine Society, *supra* note 2.

[5] Radiculopathy is "impairment of a nerve root, usually causing radiating pain, numbness, tingling or muscle weakness that correspond to a specific nerve root." North American Spine Society, *supra* note 2.

stimulator was inserted. (Tr. 110.) The procedure was performed because Plaintiff had "longstanding back and leg pain unrelieved by conservative modalities." (Tr. 107.) At the time of surgery, he continued to have back pain and bilateral lower extremity pain that was worse on the right. (Tr. 115.) Plaintiff was discharged four days later after being fitted with a back brace and given prescriptions for Ceftin and Vicodin. (Tr. 106.)

Plaintiff saw Dr. Shelokov on May 6, 1993, and admitted that he had resumed smoking. (Tr. 173.) The doctor warned Mr. Couffer that smoking during his recovery could prevent his spine from fusing. (Tr. 173.)

Mr. Couffer attended physical therapy from June 21 through June 25, 1993, and actively participated in group psychotherapy sessions on June 3 and 24, 1993. (Tr. 167-68, 170.) Plaintiff saw Dr. Deschner on June 23, 1993, for a behavioral health followup. (Tr. 169.) He reported feeling better since the surgery and was optimistic about his chances for recovery. (Tr. 169.)

Plaintiff saw Dr. Deschner on June 30, 1993. (Tr. 166.) The doctor reported that Plaintiff had recently completed several psychological evaluations, including the Minnesota Multiphasic Personality Inventory ("MMPI-II"), the coping strategy questionnaire, the pain and impairment relationship scale and the short form Magill Pain questionnaire. (Tr. 166.) The tests revealed that Plaintiff had a "strong tendency to minimize" his symptoms and was "somewhat guarded in minimizing the expressions of normal concerns in his every day life." (Tr. 166.) His one significant clinical scale revealed somatization,[6] which was supported by results from other

---

[6] Somatization is defined as "conversion of a mental state (as depression or anxiety) into physical symptoms; also :the existence of physical bodily complaints in the absence of a known medical condition." Merriam Webster, Medical Dictionary, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=somatization (last

6

tests. (Tr. 166.)

Mr. Couffer saw Dr. Shelokov on July 9 and 15, 1993, and on August 12, 1993. (Tr. 163-65.) He reported that his back and leg pain were better since the surgery. (Tr. 163-64.) Dr. Shelokov advised Plaintiff that he needed to wear his brace regularly rather than intermittently. (Tr. 164-65.) X-rays revealed that Mr. Couffer's spine had not yet fused. (Tr. 163.)

Plaintiff returned to Dr. Shelokov for a follow-up visit on September 13, 1993. (Tr. 162.) He stated that he continued to have back pain but that his leg pain had improved. (Tr. 162.) X-rays revealed essentially no motion in the fused area of his spine, but Dr. Shelkov opined that a solid fusion had not yet occurred. (Tr. 162.) He also noted that Plaintiff was at risk of developing a non-union because he continued to smoke. (Tr. 162.)

On October 4, 1993, Plaintiff saw Dr. Shelokov. (Tr. 161.) He reported that his back pain was "bad." (Tr. 161.) The doctor noted that little or no bone had formed in the bilateral lateral position of Plaintiff's spine. (Tr. 161.) He determined that Plaintiff should be weaned out of his brace so that his level of fusion could be better evaluated. (Tr. 161.) Additionally, Dr. Shelokov opined that Mr. Couffer was stable for gainful employment. (Tr. 161.) Plaintiff returned to Dr. Shelokov for a follow-up visit on November 1, 1993. (Tr. 160.) He was out of his back brace and reported feeling better. (Tr. 160.) X-rays showed no fusion had yet occurred. (Tr. 160.) Dr. Shelokov stated that Plaintiff was disabled for gainful employment at that time. (Tr. 160.) Plaintiff's next follow-up visit with Dr. Shelokov was on January 26, 1994. (Tr. 159.) The doctor noted that Plaintiff had a non-union at the L4-5 disk, possibly due to his

---

accessed May 5, 2006).

7

"incessant" smoking. (Tr. 159.) He recommended the removal of Mr. Couffer's bone growth stimulator. (Tr. 159.)

On February 15, 1994, Plaintiff saw Dr. James Cable at the Texas Back Institute in Plano, Texas for an impairment rating. (Tr. 154.) Dr. Cable recounted the history of Plaintiff's treatment for his back injury that occurred on March 12, 1992, including a progressive course of epidural steroid injections, physical therapy, a facet injection and spinal surgery. (Tr. 154.) The doctor noted that, post-surgery, Plaintiff had developed a non-union at the L4-5 disc and could be a possible candidate for future surgery. (Tr. 154.) Dr. Cable performed range of motion testing and found that Plaintiff had a range of motion impairment of six percent, a specific disorder impairment of eleven percent due to his spinal fusion, and a zero percent neurological impairment. (Tr. 154.) He opined that Plaintiff's whole body impairment was 16 percent. (Tr. 154-55.)

On February 28, 1994, Plaintiff saw Dr. Shelokov for a follow-up visit. (Tr. 153.) The doctor noted that Plaintiff continued to have a non-union but that "we are going to return him to gainful employment." (Tr. 153.)

Mr. Couffer had surgery at Presbyterian Hospital of Plano to remove the bone growth stimulator on March 29, 1994. (Tr. 100.) Dr. Shelokov reported "thin" bone growth over the stimulator. (Tr. 103.) Mr. Couffer saw Dr. Shelokov for a follow-up visit on April 18, 1994. (Tr. 152.) He reported occasional back pain. (Tr. 152.) The doctor noted that Plaintiff was able for gainful employment. (Tr. 152.)

Six months later, on October 12, 1994, Plaintiff saw Dr. Shelokov for a follow-up visit. (Tr. 151.) Plaintiff reported that he was doing well and was going to school. (Tr. 151.) Dr.

8

Shelokov cleared him for light duty work. (Tr. 151.) Another six months passed before Plaintiff returned to Dr. Shelokov on April 17, 1995. (Tr. 150.) The doctor noted that Plaintiff had a broken sacral screw, but that he was "totally asymptomatic." (Tr. 150.) Dr. Shelokov prescribed a short course of Darvocet for times when Plaintiff experienced pain. (Tr. 150.)

On October 9, 1995, Plaintiff saw Dr. Shelokov for a follow-up visit. (Tr. 149.) He reported that he was doing well, was in truck-driving school, was taking no medications, and had only occasional back pain. (Tr. 149.) A physical examination revealed that he was neurologically intact. (Tr. 149.) Dr. Shelokov noted that Mr. Couffer had either a fibrous union or pseudoarthrosis at the L5-S1 disk. (Tr. 149.) One year later, on October 26, 1996, Plaintiff saw Dr. Shelokov for a follow-up visit. (Tr. 148.) He reported that he was working and "doing well." (Tr. 148.) X-rays revealed a solid fusion. (Tr. 148.)

On September 30, 1997, Plaintiff saw Dr. Cable for an annual follow-up visit. (Tr. 144.) X-rays revealed that he had a solid fusion and that his sacroiliac joints were essentially normal. (Tr. 144.) Upon examination, Plaintiff was found to have a moderately large bone spur at the L4 vertebra and moderate spurring at the L3 vertebra. (Tr. 144.) Mr. Couffer reported that he was experiencing increasing lower back pain down to the right hip and down the back of his right leg all the way to the knee. (Tr. 144.) He also reported suffering some right leg weakness. (Tr. 144.) The doctor noted that Plaintiff's reported pain had worsened since last annual visit, and that he was reporting leg weakness for the first time ever. (Tr. 144.) Plaintiff surmised that the pain began increasing six or eight months previously, with a significant increase in the past two months. (Tr. 144.) He stated that sitting increased his pain, so that he was unable to perform work as a truck driver, as he had recently attempted to do. (Tr. 144.) A physical examination

revealed that Plaintiff had no tenderness upon palpitation of the back and that extension of his back and lateral bending did not significantly increase his pain. (Tr. 145.) He had decreased sensation to light touch in areas of both legs. (Tr. 145.) During the straight leg raising test, Plaintiff experienced pain at about 70 degrees. (Tr. 145.) He had a negative Lasegue's test, a negative Cram test, normal hip motion, a negative Patrick's maneuver, and a negative sitting root test. (Tr. 145.) Dr. Cable opined that Plaintiff could be suffering lumbar facet dysfunction and possible lumbar radiculopathy, probably due to segmental dysfunction at the L3 and L4 vertebrae. (Tr. 145.) Dr. Cable recommended that Plaintiff attempt to manage his pain with Ibuprofen. (Tr. 145.)

**Plaintiff's Hearing Testimony**

Plaintiff testified on his own behalf at both administrative hearings. (Tr. 261-272, 283-306.) He stated that he had wrist pain, upper and lower back pain, neck pain, radiating leg pain and some chest pain. (Tr. 262-63, 265, 267, 287, 290-91.) He testified that he worked at Burke Royalty for fourteen years but lost his job in 1994 after he had surgery following a back injury in 1992. (Tr. 263, 284.) Subsequently, he attempted to work as a framer and a trimmer from about 1994 through 1998, but only worked one or two days per week. (Tr. 262, 284-85.) He also tried to work as a truck driver but was not hired because of his history of back problems and thereafter worked as a cement truck driver for a short amount of time. (Tr. 264, 285-86.) At some point in time, he attempted to obtain training in electronics but was unable to sit still and concentrate at the computer. (Tr. 264, 285.)

Plaintiff testified at both hearings that he experienced difficulty concentrating due to his pain. At the first hearing, he testified that he finally stopped working because he was

10

experiencing shortness of breath and couldn't concentrate due to his cardiac problems.[7] (Tr. 265.) At the second hearing, Mr. Couffer testified that he would lose concentration after sitting for long periods of time. (Tr. 291.) Upon examination by the ALJ, he stated that he was unable to concentrate when he had flare-ups of pain. (Tr. 305.) He also testified that there were no times when he was free of back and wrist pain. (Tr. 291.) Plaintiff also stated that he suffered from depression. (Tr. 266, 296.)

Regarding his activities of daily living, Mr. Couffer testified that he was able to do very few activities other than light housework and rarely drove anywhere because he was in constant pain. (Tr. 264, 299.) He stated that sometimes the pain kept him up all night. (Tr. 294-95.)

A vocational expert, Clifton King testified at both hearings. (Tr. 308.) At the first and second hearings, he stated that Plaintiff had previously performed work as a oil pumper, which he classified as light-exertion skilled work, but was performed by Mr. Couffer at the heavy range of exertion. (Tr. 274, 308.) At the first hearing, he testified that Plaintiff worked as a high level framer, which was medium-exertion skilled work, and also stated that Plaintiff attempted to work as a cement truck driver and as a cashier. (Tr. 274.) At the second hearing, Mr. King testified that Plaintiff worked as a well servicer, which was heavy-exertion skilled work and also testified that Plaintiff may have worked in other positions, but the lack of pay records precluded him from confirming the employment. (Tr. 309.)

At the first hearing, Mr. King testified that Plaintiff had acquired the skills to perform at least three light work jobs: (1) inspector and tester, (2) electronics inspector, and (3) installer

---

[7] In March 1999, more than a year after Mr. Couffer's eligibility period expired, he underwent a triple coronary artery bypass operation, which, according to the medical records, resolved his chest pain by May 10, 1999. (Tr. 129, 136, 182-83.)

inspector. (Tr. 275.) Plaintiff's attorney, at this first hearing, posed a hypothetical question to Mr. King which asked him to determine whether a person could perform any of the aforementioned jobs if he had: limited neck motion, little or no use of the right hand, very little use of the left hand, and was restricted from sitting or standing for more than twenty minutes at a time.[8] (Tr. 275-76.) Mr. King testified that such a person would be unable to perform any of the aforementioned jobs. (Tr. 276.)

At the second hearing, Mr. King testified that Plaintiff acquired the skills to perform the light-exertion, semi-skilled jobs of: (1) assembler of household appliances and (2) assembler of electrical accessories. (Tr. 312.) Upon questioning by the ALJ, he also testified that if Plaintiff's pain affected his concentration to the extent that he was unable to stay on task, then he would not be able to "viably" transfer his skills to another line of work. (Tr. 309.) Mr. King stated in response to another question posed by the ALJ in which he was asked to assume that Plaintiff would require the assistance of an assistant or job coach to maintain concentration, that jobs were available in the economy where Plaintiff could work with assistance. (Tr. 309-10.) However, in response to questioning by Plaintiff's counsel, he testified that the number of jobs for which Plaintiff had transferable skills would be reduced by fifty percent if he required the assistance of a job coach. (Tr. 312-13.)

Plaintiff's counsel asked Mr. King to hypothetically consider whether a person with Plaintiff's skills could find work if he had impairments in his hands that prevented him from carrying or lifting, pushing or pulling, handling or fingering, and only occasional reaching and

---

[8] The medical records reflect that in June 1999 Plaintiff saw Dr. Lynn Jennings complaining of reoccurring chest pain and numbness in his wrist. (Tr. 122-23.) Further testing confirmed the presence of severe degenerative arthritis in his right wrist, (Tr. 207), which had significantly increased some two and one half years later, (Tr. 211).

feeling. (Tr. 311.) Mr. King testified that he did not believe such a person could adequately perform in the workplace. (Tr. 311.) Plaintiff's counsel also asked Mr. King whether a person with Plaintiff's skills who needed to frequently change from standing to sitting would be unable to find applicable work. (Tr. 311.) Mr. King stated that there were numerous jobs available in the economy with a "sit/stand option." (Tr. 311.)

A psychological expert, Dr. Burnard Pearce, Ph.D. testified at the second hearing. (Tr. 306.) He reviewed Plaintiff's medical records which reflected that Plaintiff was a person who was prone to minimize anxiety. (Tr. 307.) He noted that Plaintiff's records mentioned a somatization disorder, but did not contain a diagnosis. (Tr. 307.) He opined that Plaintiff's symptoms did not fit the criteria for a somatization disorder. (Tr. 307.) Dr. Pearce stated that it was "pretty obvious that there are interruptions in his ability to concentrate that are secondary to that pain." (Tr. 307.) He observed that Plaintiff's ability to concentrate would be dependant on the level of pain he was experiencing at any given point in time, but that when experiencing a lot of pain, his ability to concentrate would be "substantially" impaired. (Tr. 307-08.)

**Plaintiff's Allegations**

Plaintiff alleges that the ALJ's Residual Functional Capacity ("RFC") finding, which omits any reference to concentration limitations due to pain, is not supported by substantial evidence because: (1) the ALJ ignored the testimony of the consulting psychological expert, (2) the ALJ ignored the testimony of the vocational expert and (3) the ALJ improperly acted as a vocational expert when making determinations regarding Plaintiff's work activities. The Magistrate Judge finds that Plaintiff's arguments are without merit and that the ALJ's RFC finding is supported by substantial evidence.

**The ALJ Adequately Discussed the Testimony of Dr. Pearce**

Plaintiff argues that the ALJ did not adequately consider the testimony of the non-examining psychological consultative expert, Dr. Burnard Pearce, who testified that Plaintiff was prone to "minimize" his symptoms and that his ability to concentrate could be "substantially impaired" when he experienced severe pain.  In the court's opinion Plaintiff overstated the opinion expressed by Dr. Pearce.  The expert somewhat qualified the weight he gave to the reports which noted a somatization disorder, noting that Mr. Couffer's symptoms did not fit the criteria for this condition.  Further, he did not express an opinion concerning the level of pain which Mr. Couffer experienced prior to December 31, 1997, noting only that heightened pain would impair the ability to concentrate.

Under Social Security Ruling 96-6p, and in accordance with 20 C.F.R. § 404.1527(f), the findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairment must be considered by an ALJ in his or her decision, but the ALJ is not bound by these findings.  SSA 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996); *see Willridge v. Barnhart*, 54 Fed. Appx. 592, 592 (5th Cir. 2002) (holding that an ALJ properly rejected a consultative examiner's finding "because it was inconsistent with the examiner's own clinical findings as well as other objective medical evidence in the record"). Instead, regardless of whether the ALJ accepts or rejects these findings of fact, the ALJ is required to explain in his or her decision the weight given to each finding.  SSA 96-6p, 1996 WL 374180, at *2.  Section 1527(d) lists the specific factors that should be included in an ALJ's discussion.  However, a court may find that an ALJ applied the proper legal standards in his decision even where the ALJ did not discuss any or all of the factors listed in § 1527(d).  *See*

14

*Frames v. Barnhart*, 156 Fed. Appx. 688, 692-93 (5th Cir. 2005) (holding that an ALJ complied with § 404.1527(d) when she provided a "pretty exhaustive list" of her findings but failed to specifically recount and assess the findings of one doctor).

In this case, the ALJ fully complied with § 404.1527(d) and (f).  While he did not specifically mention Dr. Pearce's testimony regarding Plaintiff's ability to maintain concentration while working, the ALJ discussed the results of the psychological tests that were performed on Plaintiff in 1993, the lack of evidence that Plaintiff "persistently reported any significant mental and/or emotional complaints," and noted that Mr. Couffer continued to engage in significant part-time work activity that required "very significant memory, concentration, and other mental skills" after December 31, 1997.  (Tr. 19-20, 22.)  He found that Plaintiff did not suffer more than "mild restrictions of activities of daily living; mild (if any) difficulties in maintaining social functioning; mild (seldom occurring) deficiencies of concentration, persistence and pace; and no episodes of deterioration or decompensation."  (Tr. 20.); *see* 20 C.F.R. § 416.920a.

The ALJ's analysis of Plaintiff's concentration limitations reasonably took into account the testimony of Dr. Pearce.  While Dr. Pearce testified that "its pretty obvious that there are interruptions in his ability to concentrate that are secondary to...pain" he also indicated that Plaintiff's ability to concentrate at any given time was directly related to the level of pain he was experiencing. (Tr. 307-308.)  The records to which Dr. Pearce referred consisted of a post-injury, pre-surgery behavioral health follow-up as well as post-surgery examination and testing and Plaintiff's participation in group psychotherapy sessions, which ended on June 30, 1993.

Plaintiff's records show only treatment for back pain prior to his date last insured December 31, 1997, and indicate that, three months prior to his date last insured, Plaintiff managed his back pain solely through use of Ibuprofen.  (Tr.  145.)  Moreover, the doctor treating his pain did not believe that Plaintiff required stronger oral pain medications or pain-relieving injections.  (Tr. 158.)  Additionally, Plaintiff's medical records reveal that he never complained of reduced concentration levels.  Though Plaintiff argues that the 1993 clinical finding that Plaintiff tended to "minimize" his symptoms explains the total absence in the medical records of any complaints made by Plaintiff regarding his ability to concentrate, this argument is without merit.  Even if that be true, it does not follow that the ALJ's rejection of his alleged disabling pain lacked substantial support.

**The ALJ Adequately Discussed the Testimony of Clifton King**

Plaintiff also argues that the ALJ improperly discounted the testimony of the vocational expert who stated that an individual who suffered from chronic, severe pain would be unlikely to maintain employment.  Specifically, he refers to testimony in which his counsel stated: "...if an individual has a chronic, *ongoing problem with concentration due to severe pain*, the individual might be able to obtain a job, but maintaining it over the long haul would be unlikely." (Tr.  310.) (emphasis added).  The vocational expert concurred in this observation.  (Tr.  310.)  However, an ALJ may disregard a vocational expert's response to a hypothetical question if the ALJ finds that the evidentiary assumptions behind the hypothetical are not supported by the record.  *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985.)  In this case, the ALJ determined that Plaintiff's alleged mental impairment (inability to concentrate due to pain) was not sufficiently severe, either individually or in combination with his physical impairments, to effect his RFC.  The record

supports this conclusion.  As discussed, *supra*, Plaintiff's medical records do not indicate that he received any psychological treatment after June 30, 1993.  Moreover, the medical records do not indicate that Plaintiff was suffering severe pain that could have affected his concentration *prior* to his date last insured of December 31, 1997.  Instead, it appears that Plaintiff managed his pain with Ibuprofen through early 1998, and only began using stronger pain medications in February of 1998.  (Tr.  158.)

**The ALJ's Determination of Plaintiff's RFC is Supported by Substantial Evidence**

Finally, Couffer claims that the ALJ erred in finding that there was other work in the economy which he could perform as of December 31, 1997.  Although he points to a sentence in the ALJ's findings that "[he] continues to engage in significant part-time work activity as a house construction framer," (Tr.  20), when read in context with the ALJ's decision as a whole, it is apparent that this is either a typographical error or related to December 31, 1997, the last date of Plaintiff's insured status.  Previously in his decision, the ALJ found that Plaintiff was working as late as May 2002.  (Tr.  18); *see also* (Tr 158, 220) (Plaintiff reported on February 24, 1998, that he had recently changed from framing work to trim work).  Although Plaintiff engaged in physical work following his accident in 1992, the ALJ also found that he had not engaged in "substantial gainful activity" since June 15, 1992.  (Tr.  18.)

After a discussion of Plaintiff's physical impairments, the ALJ noted that Plaintiff did not develop severe heart disease and wrist pain until after his date last insured and that "despite his complaints of continued chronic back pain and leg pain and his other health impairments, he appears to have continued to engage in significant part-time work activity as a house construction framer." (Tr. 20.)  Likewise, after reviewing Mr. Couffer's medical records for evidence of a

mental impairment and finding that the "limited" psychological testing performed before the date last insured yielded evidence of possible somatization, he stated that "[a]s shown above, the claimant continues [sic] to engage significant [sic] part-time work activity as a house construction framer." (Tr. 20.) The record s supports the conclusion that Plaintiff continued to engage in part-time work activity after his last date insured because, as late as 1999, Plaintiff reported that he was working as a framer and a carpenter. (Tr. 122, 139.)

>"Skilled work" is defined in the regulations as:

>Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity.

>20 C.F.R. § 404.1568(c).

Clearly, Plaintiff's ability to do framing work and trim work is inconsistent with any concentration impairment affecting his ability to perform such tasks, notwithstanding exertional limitations on his ability to work on a daily basis.[9] As noted in the ALJ's findings discounting Plaintiff's claim of disabling pain, the ALJ was entitled to disregard the vocational expert's answers to hypothetical questions which assumed an inability to concentrate due to unremitting and constant pain. *See Owens*, 770 F.2d at 1282.

The vocational expert testified at the initial administrative hearing the Couffer had skills which were transferable to other jobs in the economy, (Tr. 275), which was consistent with his

---

[9] As noted above, the ALJ's decision was rendered at step five of the sequential inquiry, i.e. that Plaintiff could perform other work in the economy. (Tr. 22.)

testimony at the second hearing, (Tr. 312).[10] Therefore, there is substantial evidence to support the ALJ's RFC and Defendant is entitled to judgment dismissing Plaintiff's complaint with prejudice.

Signed this 1st day of June, 2006.

                                                                      /s/ Wm. F. Sanderson Jr.

                                                                      Wm. F. Sanderson Jr.

                                                                      United States Magistrate Judge

---

[10] Plaintiff's counsel's hypothetical questions assumed wrist and manual dexterity impairments, but as noted above, *supra* note 8, this condition was first noted approximately one year and a half after Mr. Couffer's period of eligibility expired.

20